Aaron Quince was convicted of murder in the first degree, and he appeals.
Judgment affirmed.
The appeal is from a judgment of murder in the first degree. The sole contention made by the appellant on the appeal is that the evidence is insufficient to support a judgment of murder in the first degree.
The record shows that Mrs. Lena Carter Sparkman, a young white woman, lived with her husband in a thinly-settled community inhabited largely, if not entirely, by white families, situated on the outskirts of Holly Hill, a suburban town adjacent to Daytona Beach, Florida. Sometime during the afternoon of July 24, 1947 she was shot and killed at her home, while her husband was away at work. That evening her body was found by her husband and two neighbors, lying in a drainage ditch which paralleled a public road running in front of the Sparkman dwelling. An autopsy performed on the body revealed that Mrs. Sparkman had been killed instantly as the result of a bullet fired into her heart from a .32 calibre rimfire pistol. Subsequently, the appellant, a 19-year old negro, was placed on trial for the murder of Mrs. Sparkman. The judgment appealed from was entered on the verdict found by the jury.
At the trial the appellant admitted killing Mrs. Sparkman, but asserted that the shooting was purely accidental. His version of the tragic incident, as related from the witness stand, was as follows:
"* * * I went to the house. I do not know whether the back or front, how its made, but I went to the house, back I call it, you know, and I asked a lady for a drink of water and she gave me a drink of water. While I was drinking the water she asked me, she was talking about painting work. When I got through drinking the water I thanked her for the water. To my knowing I started on back around the side of the house, was going back to the truck, and a dog, a little dog, a little bitty old dog and a big dog was there, and as I went to walk by him he growled at me, so I wasn't paying much attention, but he frightened me at the time, I was already frightened once, I do not know but it seems to me I was out of my head or something and I just turned around and took the pistol out of my pocket and I do not know how close I was up on him, wasn't too far away, just made a few steps and when I went to kick the dog the lady run out of the house, she must have run out to stop him from bothering me. I never paid attention, but I turned around and I shot the gun. When I shot I was shooting at the dog and I looked around and the lady fell * * * I picked the lady up. I was frightened more. I didn't know what to do, so I taken the lady and taken her to the road and laid her on the side of the ditch, down in the ditch like. I got back in the truck. I never mentioned it to anyone because it went off my mind then. And my boss asked me the next day what, when the man picked me up, I had done, and I had to think back what I had done because I had clean forgot about it. That was all there was to it * * * (the dog) was tied when I had shot, but I didn't know he was tied, he didn't look like he was tied to me. * * *"
"Q. When did you first determine she was dead? A. When I picked her up.
"Q. Did she have hold of the dog? A. Yes. * * *
"Q. Was she leaning over holding the dog? A. She was behind the dog.
"Q. Leaning over holding it? A. But I had my back turned to her.
"Q. When you shot? A. I turned around and shot.
"Q. But you didn't have your back turned to her then did you? A. No."
There were no eye-witnesses to the homicide and the State relied largely upon evidence of physical facts and upon prior inconsistent statements made by the appellant before trial to prove that the story of the appellant was untrue. With respect to what very likely transpired at the scene during and before the killing a comparison of the evidence offered by the contending parties is therefore important:
According to the testimony of the appellant Mrs. Sparkman was crouching over the dog at the time the appellant wheeled and fired his pistol in the general direction of the animal. The autopsy performed on the body of the deceased showed that the bullet fired from the pistol held by the appellant struck the deceased squarely in the chest *Page 35 
and passed through her heart, traveling in an absolutely horizontal direction. It is pointed out by the state that the bullet would not have traveled in a horizontal direction but would have ranged downward had Mrs. Sparkman been crouching down over the dog at the time the shot was fired, as contended by the appellant.
According to the testimony of the appellant he was standing several feet away from Mrs. Sparkman at the time he turned and fired his weapon. The State's evidence showed that at the entrance of the bullet wound dense powder burns were found, conclusively indicating that the pistol could not have been fired from a distance greater than six inches from the deceased. From the testimony given by the appellant it appears that prior to the shooting Mrs. Sparkman was in a perfectly normal physical condition and that the only wound inflicted upon her body, either before or after the shooting, was the wound inflicted by the bullet fired from the pistol, which killed her instantly. The evidence produced by the State showed that on the head of the victim were two extremely severe bruises, made, apparently with some blunt instrument struck with such force as to cause severe bleeding at the ears and eyes, and that these bruises had been inflicted prior to the time that Mrs. Sparkman had been killed with the pistol. The appellant's story was that he had passed on the west side of the Sparkman house in going to and from the back door for the drink of water, and that his encounter with the dog took place on the west side. The evidence of the State was that although the ground on the west side of the house was soft no footprints were found there. The appellant denied that he was ever in the yard on the east side of the house. The evidence of the State was that on the east side of the house, at a point where the yard was grown thick with underbrush, there were signs on the ground indicating a violent tussle or struggle, and that heel prints found leading away in the direction of the place where appellant had parked his truck, matched the heels of the shoes worn by the appellant at the time of the homicide.
There can be no question but that the evidence offered by the State with respect to the physical facts were of sufficient evidentiary quality, if believed by the jury, to prove that the story told by the appellant with respect to the manner in which Mrs. Sparkman came to her death was untrue. Moreover, the story told by the appellant from the witness stand was at such variance with at least two confessions made by him prior to trial and introduced in evidence as to warrant the jury in holding, from the whole evidence in the case, that the death of the deceased had resulted from a premeditated design on the part of the appellant either to murder Mrs. Sparkman or to commit some other criminal felonious assault, upon her person, in the course of which the homicide was committed.
That the latter purpose may have been in the mind of the appellant appears not at all unlikely, when the entire evidence in the case is considered. In this respect the evidence concerning the activities of the appellant on the afternoon of July 24th and prior to the time he arrived at the Sparkman residence is most revealing.
The appellant Quince worked as a helper on an ice truck owned and operated by one John Edgar Burton. On the afternoon of the homicide Quince borrowed the truck from his employer upon the representation that he wanted to use the truck for the purpose of hauling scrap lumber with which to build a chicken coop for his landlady. After getting permission to use the truck Quince drove it to his rooming house, went to his room and procured a loaded revolver which he had purchased six days previously, put it in his pocket and drove away. Some thirty minutes after leaving the house he was driving along the public road in an empty truck in the general vicinity of the Sparkman residence. At the home of a Mrs. Malphurs he alighted from his truck and went to the back door for the ostensible purpose of getting water to put in his radiator. A few moments later, he stopped at the house next to the Malphurs home and asked for a drink of water. He stopped again at a residence only a few yards down the road and falsely represented to the white lady who came to the door that he was looking for a certain Mr. Jones, to whom, as he stated, he was to deliver three jugs of mineral water which he had on his *Page 36 
truck. He stopped his truck again at a house a short distance down the road for the purpose of ascertaining the time of day, and drove away before the lady of the house could give him the information requested. From there he traveled to the Sparkman house where, according to his own testimony, he again stopped to ask for a glass of water. All of the houses visited by the appellant were located in a more or less secluded and heavily-wooded area. At all of the residences visited by him no men were around the premises, but at all of these houses small children were present. No one was present at the Sparkman dwelling but Mrs. Sparkman, at the time the appellant went into the yard and committed the homicide.
The above facts were testified to not only by State witnesses but also by the appellant.
Although the evidence with respect to the activities of the appellant prior to the homicide may not in and of themselves appear important, we think they become highly significant as indicating a general criminal purpose, scheme, or plan when coupled with evidence introduced by the State which proved that some months prior to the homicide the appellant had served a 30-day term in the West Palm Beach jail for writing letters to a white woman. While the exact particulars of this incident and the exact wording of the letter that was written is not fully revealed by the record, we think it proper to assume that its contents were of such a criminal nature as to justify prosecution and punishment, as otherwise there could not have been a criminal charge or conviction based upon it.
The fact that the appellant shot and killed Mrs. Sparkman is not in dispute. It was established by the prosecution's evidence, a portion of which is set out in this opinion; it was admitted in written confessions made by the appellant prior to trial; and it was confirmed by the appellant when he testified at the trial on his own behalf. The only real conflict in the evidence was the manner in which the homicide was committed. The appellant gave his version of the homicide; the physical facts of the case and evidence adduced by State witnesses completely refuted his story. It was for the jury to determine from all the evidence whether the killing was accidental or committed with premeditated design. We have carefully considered the evidence and we find no error in the record. Accordingly, the judgment appealed from is affirmed.
It is so ordered.
THOMAS, C.J., and TERRELL, CHAPMAN and ADAMS, JJ., concur.
BARNS and HOBSON, JJ., not participating.